STEELE *v.* CARMICHAEL, et al.

No. 42955          May 4, 1964          163 So. 2d 663

*Henley, Jones & Henley,* Jackson, for appellant.

*Earl T. Thomas, Robert G. Gillespie, Jr., Alex A. Alston, Jr., Wells, Thomas & Wells,* Jackson, for appellees.

PATTERSON, J.

This is a chancery action involving a contract for the purchase of one-half interest in stock of the Bank of Utica belonging to G. B. Carmichael, one of the defendants below, such stock representing a controlling interest in said bank. By this suit complainant sought an injunction to prevent disposal of the stock pending disposition of the suit, a discovery as to the cost to Carmichael, and for enforcement of the contract, as well as for general relief. The defendant Carmichael filed a separate answer and cross-bill admitting the execution of the contract but alleging that said agreement was invalid on the grounds it was executed under duress and compulsion at a time when complainant and defendant were in a confidential relationship, and that a constructive fraud was committed by the complainant as against the defendant in the execution of the agreement. This answer and cross-bill was adopted by the defendants, Wells as a purchaser of the stock, and by the First National Bank as a lienholder on the stock, both with notice of the transaction between complainant Steele and the defendant Carmichael. The allegations of the cross-bill were denied by Steele.

After a lengthy hearing by the court below, a decree was entered upholding the contract and awarding complainant a monetary judgment thereon in the sum of $17,130 with interest. In all other respects the bill of complaint was dismissed with prejudice, as was the cross-bill. From this decree complainant appeals and defendants cross-appeal.

The principal issues presented for determination are (1) whether the court was correct in deciding that no confidential relationship or fraud was proven so as to

cancel the contract; (2) whether the court was correct in the construction of the contract, and (3) whether the court was correct in the determination of the average cost of the shares of stock here involved.

After a careful consideration and reconsideration of the record, this Court cannot say the chancellor was in error in his findings: "In this court's opinion, no confidential or fiduciary relationship between Steele and Carmichael has been established, and no fraud has been proved. It is not a conventional confidential or fiduciary relationship, and so it would have to be one in fact, and the facts do not prove such relationship. These parties were dealing more or less on an equal basis, and we don't have to go outside Mississippi law to find very clear statements on what constitutes a confidential or fiduciary relationship. We can go back to the landmark case of Ham v. Ham and come on down through the cases of Watkins v. Martin, et al., and In Re Lindemann's Estate, to the recent case cited by counsel for complainant; all of these cases set forth very clearly what Mississippi law is on the question of confidential and fiduciary relationships."

We hold, therefore, that the chancellor was correct in his findings and conclusions that there was no confidential relationship or fraud in connection with the procurement of the contract. We hold further, from the record, that complainant is in court with clean hands and not in violation of any law whatsoever. No good purpose would be served, in our opinion, in here detailing the lengthy record in this regard.

Appellant contends that the court below erred in its construction of the contract inasmuch as it permitted a private sale under paragraph 3 thereof. We hold this point is well taken. The contract reads in full text as follows:

"FOR AND IN CONSIDERATION OF $1.00, each paid to the other, receipt of which is hereby acknow-

ledged, the undersigned parties G. B. CARMICHAEL AND HORACE STEELE, agree as follows:

"1. Said Horace Steele agrees to arrange a loan for $61,443.71 with a lending bank or agency. The said Horace Steele agrees to guarantee said loan for the said G. B. Carmichael and will assist in any other arrangements from time to time that have to be made in the financing and carrying of this loan.

"2. Said G. B. Carmichael agrees to sell one-half of his common and preferred stock, less his qualifying shares, to the said Horace Steele at his average cost.

"3. The said Horace Steele and G. B. Carmichael agree that they will, if either one desires to liquidate his stock, sell together for the same agreed price.

"WITNESS our signatures this the 20th day of July, 1961.

"/s/  G. B. Carmichael
"/s/  Horace Steele

"WITNESSES:
"/s/  Mary W. Campbell
"/s/  Louise M. Brantley"

The court below construed the third paragraph of the contract as follows: "In the third paragraph of the contract, it says that 'the said Horace Steele and G. B. Carmichael agree that they will, if either one desires to liquidate his stock. . .,' and the 'either one' would be G. B. Carmichael who did desire to liquidate his stock, and the stock was sold. An agreement was made in the contract that they would sell together for the same agreed price, so I construe this contract to mean that under this sale Horace Steele, the Complainant, is entitled to a judgment against G. B. Carmichael for $17,500.00. I would say that he is entitled to a judgment against G. B. Carmichael, the First National Bank, and W. Calvin Wells, Jr., as Trustee."

It is obvious from the terms of the agreement that either of the contracting parties, if he so desired, could effect a sale of the stock. By the act of selling, Carmichael signified his desire to liquidate his stock. This brings into focus the remainder of paragraph 3 for our consideration, such remainder being, "The said Horace Steele and G. B. Carmichael agree that they will, if either one desires to liquidate his stock, sell together for the same agreed price." This means in ordinary terms, and we so construe the contract, that the parties thereto would act in unison or concert in selling the stock at a price agreeable and satisfactory to both. The lower court's construction of the contract which permitted a unilateral sale was erroneous.

■■ ■ Carmichael, by selling individually at a price not agreed upon by appellant, indeed the desire to sell and the sale was not revealed to appellant until after its accomplishment, surreptitiously violated the plain terms of the contract. The validity of the contract having been upheld, it becomes the duty of the court to see that its terms are complied with. We hold, therefore, that since one has expressed a desire to liquidate his stock, the parties to the agreement should have a reasonable time, thirty days from the finality of this decision, to sell together for the same agreed price. If they are unable so to do within the specified time, then the stock here in question should be sold after due notice at public sale for the highest price, the net proceeds therefrom to be equally divided between the contracting parties.

The appellant next contends that the lower court was in error in its conclusion as to the average cost of the shares of stock, as mentioned in paragraph 2 of the contract, "2. Said G. B. Carmichael agrees to sell one-half of his common and preferred stock, less his qualifying shares, to the said Horace Steele at his average cost." Counsel agree as to the cost of all stock except

the 51 shares obtained from Mrs. Iloe B. Carmichael. The court below held in regard to this stock as follows:

"The connection of the Carmichaels with the Bank of Utica goes far back in years. Mr. G. B. Carmichael's father before him was President of the Bank of Utica, and Gerald grew up with the bank. His mother owned 51 shares of stock in the bank and, while there is some testimony that would indicate a sale of the stock by his mother to Gerald, I think the more consistent testimony and the more logical testimony is that there was not a sale of these shares of stock owned by Mrs. Iloe B. Carmichael, but a loan of this stock to Mr. G. B. Carmichael. I presume that Gerald was dealing with that stock just exactly like I would be dealing with my mother's stock if I had to borrow stock from her. I would want to vote the stock, use it to aggregate a majority of the stock for control purposes, and things of that sort. The consistent testimony is that there was a loan of the stock to her son, G. B. Carmichael, and that he was to return to her 51 shares of stock. I say this to lead up to my finding that this was a wash transaction, as far as securing the 51 shares of stock from Mrs. Carmichael. Gerald Carmichael paid his mother $652.00 a share for these 51 shares, which was the purchase price that was paid to G. B. Carmichael by Mr. W. C. Wells, Jr., so I would figure in that stock at $33,252.00 as the cost."

██ ██ In this we find the chancellor to be in error. The documentary evidence in this record indicates that on September 11, 1951, Carmichael drew a draft on the Commercial Bank & Trust Company of Jackson, Mississippi, for $7,650 and deposited it to his account in the Bank of Utica. On this same day he issued a check to his mother, Mrs. Iloe B. Carmichael, on this account in the amount of $7,650. Upon this check there was written these significant words and figures: "For 51 shares of stock." This check was endorsed by the payee

and cancelled by perforation on September 11, 1951. On the same day the sum of $7,650 was deposited in the savings account of Mrs. Iloe B. Carmichael. The 51 shares of stock divided into the gross purchase price represents the purchase price of each share of stock, towit, $150. There is testimony which confuses the issue to some extent and which necessitates a review of the record as to Carmichael's testimony in this regard.

"Q. Then you never did buy this stock from your mother, although you took it and borrowed money on it?

"A. I gave her a note for it.

"Q. You never did give her a check for it?

"A. No, sir.

"Q. And you are positive of that?

"A. That is the best of my knowledge, yes, sir.

"Q. Well now, did you borrow the stock or did you buy it?

"A. I borrowed the stock.

"Q. And you're going to plant yourself on that?

"A. I don't believe that I did. Like I say, I don't have any records that far back. This is the paper, and mother says I never have paid it; I mean she has told me that.

"Q. And you swear that you didn't buy your mother's stock and then give her a check for it?

"A. To the best of my knowledge, I didn't.

"Q. I show you a check here that is made off the microfilm records of the Bank of Utica. (Hands check to witness). I ask you to state what that is.

"A. (Examining check). That is one that I don't remember a thing about. It says 'September 11, 1951. Mrs. Iloe B. Carmichael, $7,650.00, for 51 shares stock, Bank of Utica.'

"Q. Look on the back and see if it has got your mother's endorsement.

"A. Yes, sir.

"Q. All right, sir. Now after I have shown you that check, do you still testify that you didn't buy your mother's stock and pay for it?

"A. This note right here — As far as that particular money is concerned, I don't remember. Did you check the accounts down there to see the account that this check went to?

"Q. Well, you are on the witness stand now.

"A. Yes, sir.

"Q. Will you deny that you paid for that stock with that check to your mother? It shows for 51 shares of stock there, doesn't it?

"A. According to that check, it does, yes, sir.

"Q. Well, will you swear that is not your genuine signature, that photostat there?

"A. That's my signature.

"Q. Well now, a good bit of time has elapsed.

"A. That's true.

"Q. Won't you now admit that you bought that stock and paid $150 a share for it and it was a closed transaction and it was deposited to your mother's account?

"A. I don't remember, Mr. Henley.

"Q. Well, will you deny that?

"A. I don't remember it. I would have to look and see if I could dig it up.

"Q. You admit that is your signature on this check, do you not?

"A. Yes, sir, that's my signature."

And further:

"Q. What do you say is the cost to you of that 51 shares of stock, Mr. Carmichael?

"A. The cost to me of that 51 shares is $652 a share.

"Q. When was that arrived at?

"A. It was arrived at at the time I completed the transfer to Mr. Wells.

"Q. What was the note that you gave your mother?

"A. I gave her a note for 51 shares of stock to be

returned to her in the form of 51 shares of stock, and when the stock was sold to Mr. Wells, then I executed a new note in her favor for the amount that would be represented by that particular amount multiplied by the $652.

And further in this regard we find:

"Q. Will you read that note?

"A. Yes, sir. (Reading): 'Utica, Mississippi, February 21, 1959,' and it lists up here '$5,100.00' which merely referred to parity, but that is just for our purposes of showing the 51 shares: 'February 21, 1960, after date, I promise to pay to the order of Mrs. Iloe B. Carmichael 51 shares of bank stock which were borrowed and are to be repaid in Bank of Utica stock,' and then I signed it; it is a regular note form.

"Q. Now do you have any previous note showing where that was a renewal of a previous note?

"A. This was a renewal of previous notes that I had given her from time to time."

Thus we find the evidence of the one person in the best position to know the true facts to be in contradiction.

Appellee relies upon the case of Posey v. Witherspoon, 227 Miss. 189, 85 So. 2d 908, as support of his position, as follows: "A jury has the right to appraise contradictions within the testimony of a witness, and to determine for itself at what point she is telling the truth and at what point she is confused or testifying falsely. 32 C.J.S., Evidence, Sec. 1040(c), pages 1112-1113."

Appellant relies upon the case of Teche Lines v. Bounds, 182 Miss. 638, 179 So. 747, and authorities there cited, in support of his position, wherein it is said:

"If there be any one thing in the administration of law upon which the decisions, the texts and the general opinion of bench and bar are in agreement, it is that evidence which is inherently unbelievable or incredible is in effect no evidence and is not sufficient to sustain

a verdict. . . . . Where evidence is so contrary to the probabilities when weighed in the light of common knowledge, common experience, and common sense that impartial, reasonable minds cannot accept it other than as clearly an improbability, it will not support a verdict.

"It has been commonly said: Verdicts must rest on probabilities, not on bare possibilities. . . . An inherently incredible story is not made credible by being sworn to. Nor can it be allowed to serve as the foundation of a verdict. . . . . Courts are not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible, . . . . although there may be evidence tending to support it. . . . The jury will not be warranted in finding the existence of a fact on the positive testimony of a witness, which is contrary to conceded facts or matters of common knowledge, or to all reasonable probabilities. . . . . . As this court has frequently said, verdicts and judgments in civil actions must be based on the probabilities of the case, not on possibilities; and a verdict, although it is treated with great respect, has no force to convert a possibility into a probability. . . . Though this Court will not undertake to measure the probative force of the conflicting testimony of witnesses upon controverted issues of facts, but . . . . must leave those matters. . . . to the jury for determination, still (the court) is not so deaf to the voice of nature, or so blind to the law of physics, that every utterance of a witness in derogation of those laws will be treated as testimony of probative value for the consideration of the jury, simply because of its utterance."

Here there was a positive sale in 1951, long prior to this suit, of this stock. There is in evidence a check in the sum of $7,650 upon which is written "for 51 shares of stock." This check was deposited to the account of appellee's mother, she then being the owner of such stock. There is no testimony whatever of a retransfer

of the stock to appellee, yet he testifies that in 1959 he borrowed the identical shares of stock from his mother without any explanation as to a retransfer of the same to him. He was in a position to explain, he was given an opportunity so to do, and he made no clarifying statements, even though he had listed the stock as an asset in his financial statement of October 28, 1960, to the Deposit Guaranty Bank without mention of any obligation thereon to his mother. It is our opinion, and we so hold, particularly in view of the self-serving nature of the testimony as pertains to the 1959 note mentioned by the defendant, that the uncertainties of the testimony must give way to that which is certain, the possibilities must give way to the reasonable probabilities. That which is certain here and exhibited is the check of Carmichael to his mother for the stock and her endorsement thereon, and the ledger sheet of the Bank of Utica showing the proceeds deposited to the account of Mrs. Iloe B. Carmichael. The mathematical correctness of this transaction verifies the gross amount paid for the 51 shares, leaving by mathematical computation $150 as the correct cost per share.

We conclude that the cost of this particular block of stock was $150 per share, and in holding to the contrary by the reliance upon a presumption the chancellor was manifestly wrong. The cause is affirmed as to the holding of the lower court that there was in fact no confidential relationship between the parties and that no fraud was perpetrated in the procurement of the contract. We reverse the lower court in its construction of paragraph 3 of the contract, and its findings and conclusions as to the cost of the 51 shares of stock formerely belonging to Mrs. Iloe B. Carmichael, and the cause is reversed for negotiations and sale in accordance with this opinion.

Affirmed in part, reversed in part, and remanded.

*Lee, C. J., and Ethridge, Rodgers and Brady, JJ.,* concur.